J-A02009-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                                :          PENNSYLVANIA
                                :
        v.                      :
                                :
                                :
AARON ERNEST JOHNSON            :
                                :
        Appellant               :    No. 67 WDA 2022

Appeal from the Judgment of Sentence Entered August 26, 2020
In the Court of Common Pleas of Clarion County Criminal Division at
            No(s):  CP-16-CR-0000168-2019

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                                :          PENNSYLVANIA
                                :
        v.                      :
                                :
                                :
AARON ERNEST JOHNSON            :
                                :
        Appellant               :    No. 68 WDA 2022

Appeal from the Judgment of Sentence Entered August 26, 2020
In the Court of Common Pleas of Clarion County Criminal Division at
            No(s):  CP-16-CR-0000169-2019

BEFORE:  BOWES, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: JUNE 6, 2023**

        Aaron Ernest Johnson appeals from his aggregate judgment of sentence

of thirty-eight years and four months to seventy-six years and eight months

of incarceration imposed after a jury convicted him of, *inter alia*, drug delivery

---

[*]  Retired Senior Judge assigned to the Superior Court.

resulting in death, corrupt organizations, and conspiracy—delivery of a controlled substance. We affirm.

We glean the following factual history of this case from the certified record.[1] William Stout ("Decedent") suffered from a heroin addiction. Sadly, but all too unsurprisingly, his addiction led to criminal activity and incarceration followed by struggles with recovery. In 2018, Decedent was on state parole. After Tanya Brooks, his paramour and one-time fiancé, gave him an ultimatum about staying clean, Decedent moved into an apartment above the stand-alone garage at the home of Ms. Brooks's parents. As Ms. Brooks lived with her parents, this proximity was designed to allow the couple to "reestablish trust and boundaries." N.T. Trial, 7/29/20, at 61. Decedent's normal routine was to go to his job at Commodore Homes, return to the apartment, eat, shower, and then spend the evening on the couch

_____

[1] We note with displeasure that the factual recitation in Appellant's brief is blatantly biased and rife with argument in contravention of Pa.R.A.P. 2117(b) ("The statement of the case shall not contain any argument. It is the responsibility of appellant to present in the statement of the case a balanced presentation of the history of the proceedings and the respective contentions of the parties."). Counsel's duty to zealously represent his client does not supersede his obligation to abide by procedural rules. While we decline to penalize Appellant for counsel's failure to comply with Rule 2117, we admonish counsel that overzealous advocacy risks prejudicing a client rather than advancing his interests. *See*, *e.g.*, *Commonwealth v. Rodgers*, 605 A.2d 1228, 1233 (Pa.Super. 1992) (declining to punish the appellant for counsel's "blatantly partisan" statement of the case, but observing that, "[w]hen the circumstances warrant it, we will not hesitate either to quash an appeal or to remand for preparation of a new brief").

watching television or to come into the house to see what the family was doing. *Id*. at 69-70.

On the morning of November 19, 2018, Decedent called his co-worker, Spencer Rudolph, at 6:39 a.m. before clocking in at work at 6:53 a.m. *Id*. at 179. Rudolph, who had clocked in at 6:46, met Decedent in the workplace bathroom before their 7:00 shifts and sold Decedent five stamp bags of heroin. *Id*. at 184. Decedent clocked out of work at 4:37 p.m. and parked his truck outside his apartment. *Id*. at 68-71, 178. At approximately 5:15, Decedent came into the house to speak with Ms. Brooks about Thanksgiving, exhibiting no signs of being under the influence of drugs. *Id*. at 70, 84. Since she was rushing to get her son to basketball practice, she told Decedent that she would stop by the apartment later to talk about it. *Id*. at 66. As she was leaving, Ms. Brooks saw Decedent's parked truck outside and could see him sitting on the couch through the open shade of his apartment's window.

When Ms. Brooks did not feel well that evening, she texted Decedent at 9:32 p.m. to let him know that she was not going to come visit him after all. Decedent did not respond to that message or two others she sent between then and 11:27 p.m. Ms. Brooks looked out her window several times that night and saw that the light was still on, but did not see Decedent in the window, so she supposed he fell asleep on the couch. *Id*. at 72-75. Neither Ms. Brooks nor her father saw anyone come or go from Decedent's apartment that night. *Id*. at 75, 97-98.

The next morning, Decedent's truck was still parked in his spot when he should have been at work. Ms. Brooks went upstairs to the apartment where the shade was still open, the television was on, and water was running in the bathtub.[2] Upon entering the bathroom, she discovered Decedent naked in the bathtub. He was dead. *Id*. at 78. The police were summoned and found no obvious cause of death and no drugs in the apartment aside from a prescription for Gabapentin. *Id*. at 133. Nor were any text or voicemail messages concerning drugs found on his phone. *Id*. at 165. Accordingly, the police did not begin a criminal investigation until a toxicology report revealed on January 28, 2019, that Decedent had died from a fentanyl overdose.[3] *Id*. at 107-09, 162-63.

Clarion County Police Chief William Peck, who was in charge of the local drug task force, reexamined Decedent's contacts in his cell phone. The name "Spencer," which the phone indicated Decedent had called the day before he was found dead, overlapped with a tip Chief Peck had received a few days prior. Chief Peck had noted Rudolph's name and number on a scrap of paper as an individual reportedly selling heroin in Shippenville. *Id*. at 166-67. Chief

---

[2] Water bills for the apartment during Decedent's residence revealed typical usage of around 1,000 to 1,200 gallons per month. During the billing period that had just begun on November 14, 2018, the usage was 3,000 gallons. The next bill was zero. *See* N.T. Trial, 7/29/20, at 264-65.

[3] Decedent had not filled any prescriptions for fentanyl in 2018. *See* N.T. Trial, 7/30/20, at 71.

Peck thus focused the investigation on Rudolph, engaging in surveillance, conducting a controlled buy, and ultimately executing a search warrant at Rudolph's residence on February 13, 2019. *Id*. at 169.

At a subsequent interview, Rudolph, himself addicted to opiates, ultimately admitted to selling the heroin to Decedent on Monday, November 19, 2018. *Id*. at 184; N.T. Trial, 7/30/20, at 89. Rudolph indicated that he had obtained the plain, unmarked stamp bags that he sold to Decedent from Joseph Hoffman in Brockway, Jefferson County, two days prior, on Saturday, November 17, 2018. *See* N.T. Trial, 7/29/20, at 185. Video footage later obtained from the Sheetz in Brockway confirmed this exchange. *Id*. at 186-92. Rudolph stated, and Decedent's phone log corroborated, that he had called Decedent on his way back to Clarion County with the drugs. *Id*. at 193-94.

Rudolph further explained that, when Hoffman himself had been arrested and jailed, Hoffman's supplier, William Fourness of Elk County, contacted Rudolph to suggest that Rudolph begin obtaining the drugs directly from Fourness. *Id*. at 175, 205. Rudolph, representing that he could obtain more heroin from Fourness, agreed to assist the police in setting up a "buy-bust" using Rudolph's phone, which resulted in the procurement of heroin containing fentanyl. *Id*. at 199-209. Chief Peck learned that the Pennsylvania State Police had also obtained fentanyl-laced heroin from Fourness in a controlled buy that occurred on November 20, 2018. *Id*. at 209.

When interviewed by Chief Peck, Fourness identified Appellant as his heroin supplier. *Id*. at 210-13. Fourness became connected with Appellant in the late summer of 2018. While Fourness briefly used a different dealer in October, by November Appellant was his exclusive source of heroin. *See* N.T. Trial, 7/30/20, at 113, 141-43. Fourness indicated that the exclusivity was reciprocal: "Me and my wife and [Appellant] all came to an agreement that as long as I maintain my business as I did and continue to bring [Appellant] money as I did, that he would not give [to] anybody besides us." *Id*. at 155.

The criminal enterprise was as follows. While Fourness sometimes personally met with Appellant to obtain the drugs, in most instances he arranged for others to retrieve the contraband from Appellant in Monroeville, outside Pittsburgh in Allegheny County. *Id*. at 114. Fourness utilized the services of drug users who were willing to work for drugs and a small amount of cash. He would also supply them drugs on consignment to sell to third parties and return a percentage of the proceeds. *Id*. at 118-20.

Fourness did not want his dealers to know how to contact Appellant directly, as they might decide to cut out Fourness as the middleman. *Id*. at 118. Instead, only he would call, text, or Facetime Appellant to arrange the place for the delivery. Once Fourness's runners were at the set location, Fourness would advise Appellant they were there and what they were driving. *Id*. at 116. Sometimes the runners would pay Appellant for the drugs, other

times Fourness would wire the money to Appellant through Western Union.[4]

*Id*. at 125. Hoffman was Fourness's initial choice to meet with Appellant in Monroeville, doing so on about a dozen occasions before Hoffman was arrested. After Hoffman was arrested, a mutual friend suggested Rudolph as a replacement, who made the trip approximately six times. *Id*. at 121-22. When Rudolph was unavailable, he utilized Ryan Gleixner "to help me continue my day-to-day operations." *Id*. at 124.

Chief Peck also went to the Elk County Jail to interview Hoffman. *See* N.T. Trial, 7/29/20, at 216. Hoffman confirmed Fourness's description of the workings of the operation. Namely, the arrangement was that Fourness would send him to meet Appellant, whom he knew only as "Smooth," in Monroeville. Hoffman would then drive the drugs back to Fourness in Elk County. *See id*. at 216-17; N.T. Trial, 7/30/20, at 168-71.

Hoffman had been arrested on November 24, 2018, when he was found unconscious in his car while it was parked in a public parking lot, still running. *See* N.T. Trial, 7/30/20, at 168-71. Hoffman's car contained packets of fentanyl that Hoffman had obtained for Fourness from Appellant at a Sheetz in Monroeville on November 21, 2018. *Id*. at 174-76. Police were able to

---

[4] The police subpoenaed Western Union and obtained a record of a $4,000 transfer from Fourness at a Rite Aid store in Elk County to Appellant at a Giant Eagle store in Allegheny County in January 2019. The documentation supplied Appellant's full name, date of birth, and driver's license number. *See* N.T. Trial, 7/29/20, at 209-15; Commonwealth's Exhibit 27.

retrieve footage from security cameras to confirm this meeting. *Id*. at 170-71. Hoffman further indicated that, on November 17, 2018, he had procured heroin from Appellant and sold it to Rudolph.[5] *Id*. at 182.

Gleixner also confirmed his role in the operation, *i.e.*, getting money from Fourness to buy drugs from Appellant in Monroeville, usually at the Sheetz, taking them back to Fourness, and being permitted to keep some for his own use.[6] *Id*. at 203-04. One time, Appellant met Gleixner at the Sheetz but had him follow Appellant back to his house a few miles away to retrieve the drugs from the basement. *Id*. at 206. Ultimately, Gleixner cooperated with the police by directing Chief Peck and a state trooper to Appellant's house at 331 Noel Drive. *Id*. at 210; N.T. Trial. 7/29/20, at 230.

Chief Peck worked with the Monroeville police to conduct surveillance of that residence in the beginning of March 2019. Appellant utilized two vehicles to come and go from the residence, a Jeep that was registered to Appellant, depicted in the Sheetz video, and was described by the runners, and also a black BMW. *See* N.T. Trial, 7/31/20, at 22. Appellant was observed coming and going to 331 Noel Drive but spent nights at a halfway house. *See* N.T. Trial. 7/29/20, at 234-37. An examination of the residence's curbside trash

---

[5] The video footage from that date was not available.

[6] Gleixner indicated that he suffered from severe neuropathy and turned to illegal narcotics when his providers cut back on his pain medication. *See* N.T. Trial, 7/30/20, at 209.

revealed evidence of drug packaging, and a stop of a third party's vehicle that had just left the residence resulted in the seizure of a stamp bag of suspected contraband. *See* N.T. Trial, 7/31/20, at 6, 12. Armed with this information, Chief Peck and a state trooper decided to apply for a search warrant for 331 Noel Drive. Chief Peck issued instructions that if Appellant left the residence in the meantime, he was to be detained. *See* N.T. Trial, 7/29/20, at 239.

Timothy Smith was another third party who purchased stamp bags for his personal use from Appellant in Monroeville, including on March 12, 2019. *See* N.T. Trial, 7/30/20, at 224-28. On that date, Appellant asked Mr. Smith if he could give him a ride, and Mr. Smith obliged. *Id*. at 227-28. Mr. Smith pulled up in front of 331 Noel Drive in his Toyota, Appellant got into the front passenger seat, and before they travelled very far, multiple police cars stopped them and arrested Appellant. *Id*. The police recovered a bag of heroin from the floor of Mr. Smith's vehicle between Appellant's feet. *See* N.T. Preliminary Hearing, 4/9/19, at 43-44, 57.

Chief Peck then participated in executing the search warrant of the residence. Police found indicia that Appellant resided at 331 Noel Drive, including mail addressed to him there and a photograph of him and his girlfriend, Wakita Owens. *See* N.T. Trial, 7/29/20, at 245. Ms. Owens showed Chief Peck a link to an article about Fourness's arrest in the buy-bust that Appellant had sent to her through Facebook Messenger with the comment: "This is my people that got set up[.]" *Id*. at 247; Commonwealth's Exhibit

50. Among the items seized were a money counter, cutting agents, packaging materials for stamp bags, and drugs, including fentanyl, in the basement, an office, and a bedroom. *Id*. at 241-44; N.T. Trial, 7/31/20, at 32-33. All told, there was enough drugs for 900 stamp bags. *See* N.T. Trial, 7/31/20, at 34.

Both of the above-captioned cases were then filed in Clarion County. At CP-16-CR-0000168-2019 ("Case 168"), Appellant was charged with, *inter alia*, drug delivery resulting in death, corrupt organizations, conspiracy—corrupt organizations, criminal use of communications facility, and multiple counts of delivery of a controlled substance occurring in November 2018. At CP-16-CR-0000169-2019 ("Case 169"), Appellant was charged with multiple counts of possession with intent to deliver ("PWID"), possession of drug paraphernalia, driving with a suspended license, and conspiracy—PWID with Ms. Owens as the alleged coconspirator, in connection with the events of March 2019.

Appellant was initially represented by the Clarion County Public Defender's office, but counsel withdrew due to a conflict of interest and Michael Marshall, Esquire, was appointed in his stead. On June 21, 2019, Attorney Marshall filed a pretrial motion in Case 169, seeking: (1) to dismiss the charges for lack of subject matter jurisdiction because none of the March 2019 acts that formed the basis for the charges occurred in Clarion County; and (2) to suppress all of the evidence obtained from the warrantless stop and search of Smith's Toyota, as well as from the execution of the warrant at 331 Noel Drive. *See* Pretrial Motion, 6/21/19, at ¶¶ 6-9, 12-14. By order of

June 25, 2019, the trial court scheduled a hearing on the omnibus pretrial motion to take place on Monday, August 12, 2019. The date of the hearing was confirmed at a July 10, 2019 conference. *See* Criminal Conference Report, 7/12/19.

On August 5, 2019, private counsel Eric A. Jobe, Esquire, filed a praecipe to enter his appearance on Appellant's behalf. In the late afternoon of Friday, August 9, 2019, Attorney Jobe filed a motion to continue Monday's pretrial motion hearing, indicating that he had not had time to draft a suppression motion and would not be able to attend the scheduled hearing because he was in the midst of a trial in federal court. *See* Motion to Continue, 8/9/19, at 1. The trial court promptly entered an order denying the motion and indicating that the hearing would proceed as scheduled with Attorney Marshall, who had not withdrawn as counsel. *See* Order, 8/9/19.

At the outset of the hearing, the court discussed the issues raised in the motion and entertained argument from Attorney Marshall and the Commonwealth on the jurisdiction issue. *See* N.T. Pretrial Motion, 8/12/19, 3-15. Appellant then addressed the court directly to complain that there were additional issues he wished to raise concerning police misconduct that were not included in the omnibus pretrial motion.[7] *Id*. at 15-16. The trial court

---

[7] Although at the pretrial motion hearing and a subsequent hearing Appellant indicated that he had "tons" of other issues that he wanted to pursue, the only additional one he identified was that Chief Peck lied when he stated that he had seen drug sales. *See* N.T. Rule 600 Hearing, 11/4/19, at 12-13.

observed that the hearing had been scheduled since June, there were deadlines for motions, and Appellant's private counsel could not "come in at the last minute and say that I need a continuance." *Id*. at 16. Appellant indicated that he merely wanted "to make a record, so this stuff will be heard someday." *Id*. The court responded, "Maybe it will. Maybe it won't." *Id*. It gave Appellant the option of proceeding that day with the issues raised in Attorney Marshall's motion or dismissing the motion without guaranteeing that Attorney Jobe would be permitted to file another one. *Id*. at 16-17. The court stated that it was "not forcing [Appellant] to go forward with a hearing today," but needed to know whether they would proceed to take evidence concerning the legality of the vehicle stop. *Id*. at 17. When Appellant, after consulting with Attorney Marshall, refused to decide either way, Attorney Marshall opted to proceed with the motion, not seeing "any benefit to him having that dismissed just because of the circumstances." *Id*. at 18.

Thereafter, Chief Peck testified that he arrested Appellant without a warrant pursuant to Pa.R.Crim.P. 502(2)(b) based upon probable cause that Appellant committed the felonies alleged in Case 168 related to Decedent's death, probable cause that he had developed in February 2019 before coming to surveil Appellant in Monroeville.[8] *Id*. at 24-27. Chief Peck acknowledged

---

[8] That provision of Rule 502 states as follows: "Criminal proceedings in court cases shall be instituted by: . . . an arrest without a warrant: . . . upon probable cause when the offense is a felony or murder[.]" Pa.R.Crim.P. 502(2)(b).

that he had no information that the charges in Case 169 were connected to Clarion County.  *Id*. at 33-34.  The Commonwealth offered into evidence the affidavit of probable cause supporting the search warrant for 331 Noel Drive and the transcript of the preliminary hearing, both of which were admitted with no objection.  *Id*. at 5, 10 (Commonwealth's Exhibits 1 and 2).  At the conclusion of the hearing, the trial court entered an order allowing Attorney Marshall to withdraw.

The trial court denied Appellant's pretrial motion by opinion and order of August 28, 2019.  The cases proceeded with Attorney Jobe representing Appellant, pursuing multiple unsuccessful motions to dismiss pursuant to Pa.R.Crim.P. 600 that Appellant initially filed *pro se*.  The trial court granted the Commonwealth's request to join for trial Cases 168 and 169 with those of co-defendant Rudolph, and a trial ultimately began at the end of July 2020.

At trial, the Commonwealth presented the evidence summarized above, largely through the testimony of Chief Peck, Fourness, Hoffman, Gleixner, and Ms. Brooks.  Neither Rudoph nor Appellant opted to testify.  At the conclusion of the four-day trial, the jury found Appellant guilty of the following offenses: drug delivery resulting in death; corrupt organizations; conspiracy-corrupt organizations; criminal use of a communication facility; seven counts of delivery of a controlled substance, one each for Fourness, Hoffman, Rudolph, and Gleixner, and three in March 2019; three counts of PWID related to the traffic stop and search of 331 Noel Drive; three counts of possession of a

controlled substance or paraphernalia in March 2019; and three counts of conspiracy to deliver a controlled substance, each involving Fourness and a different runner.[9] On August 26, 2020, Appellant was sentenced to the aggregate term indicated above.[10]

Attorney Jobe filed no post-sentence motion but did file a timely notice of appeal. However, that appeal was dismissed after Attorney Jobe failed to obtain the necessary transcripts or file a docketing statement. Appellant filed *pro se* letters that the court deemed to be a timely motion for relief pursuant to the Post Conviction Relief Act ("PCRA"). Upon determining that Appellant was indigent, it granted him *in forma pauperis* status and appointed PCRA counsel. **See** Order, 2/3/21. Counsel obtained the transcripts and filed an amended PCRA petition which resulted in the PCRA court's December 7, 2021 order granting Appellant the right to file a direct appeal *nunc pro tunc*.

---

[9] At various points, the Commonwealth *nolle prossed* the charges of involuntary manslaughter, conspiracy with Ms. Owens, and driving with a suspended license.

[10] Rudolph was also convicted of many of the same offenses as Appellant, including drug delivery resulting in death, corrupt organizations, and conspiracy, and sentenced to an aggregate 169 to 392 months of imprisonment. However, this Court vacated Rudolph's judgment of sentence on September 13, 2022, upon determining that the trial court erred in denying Rudolph's suppression motion based upon the Commonwealth's failure to disprove Rudolph's claim that the warrant to search his residence was executed in violation of the knock-and-announce rule. **See Commonwealth v. Rudolph**, 285 A.3d 926 (Pa.Super. 2022) (non-precedential decision).

Appellant filed a timely notice of appeal *nunc pro tunc* and both he and the trial court complied with Pa.R.A.P. 1925.[11] Appellant presents the following questions, which we have re-ordered for ease of discussion:

1.  Was the evidence insufficient to support his conviction for drug delivery resulting in death because the prosecution failed to establish the required element that [Appellant] distributed the controlled substance that resulted in death?

2.  Was the evidence insufficient to support his convictions for corrupt organizations and a related conspiracy charge because the prosecution failed to establish the required element that [Appellant] was involved in an "enterprise"?

3.  Did the trial court err when it failed to dismiss the charges at trial court docket number 169 because Clarion County was not the proper venue for the trial?

4.  Did the trial court err and violate [Appellant]'s Sixth Amendment right to counsel of his own choosing when it forced [Appellant] to proceed at the omnibus hearing with court-appointed counsel after [Appellant] privately retained separate counsel?

5.  Did the trial court err when it failed to grant suppression of the evidence stemming from the warrantless car search because no exigency existed, and, as such, the search violated [Appellant]'s state constitutional rights?

Appellant's brief at 3-4 (cleaned up).

We begin with Appellant's two challenges to the sufficiency of the evidence, "as success on that basis will result in discharge instead of retrial." ***Commonwealth v. Jordan***, 212 A.3d 91, 94 (Pa.Super. 2019). Our standard of review for these claims is as follows:

---

[11] Appellant continues to be represented by PCRA counsel in this appeal.

- 15 -

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for a fact-finder. In addition, we note that **the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances**. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Haahs*, 289 A.3d 100, 104 n.2 (Pa.Super. 2022) (cleaned up, emphases added).

Appellant first claims that the evidence was insufficient to support his conviction for drug delivery resulting in death. The statute at issue defines the offense as follows:

A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of [§] (a)(14) or (30) of . . . The Controlled Substance, Drug, Device and Cosmetic Act,[12] and another person dies as a result of using the substance.

_____

[12] Section (a)(14) of the Act regulates the dispensation of drugs by medical providers. *See* 35 P.S. § 780-113(a)(14). Section (a)(30) prohibits, with exceptions not implicated here, "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not

- 16 -

18 Pa.C.S. § 2506(a). Hence, the Commonwealth satisfied its evidentiary burden if it proved beyond a reasonable doubt that (1) Appellant delivered, sold, or distributed a controlled substance to a person; (2) the delivery, sale, or distribution to a person was intentional; and (3) that the delivery, sale, or distribution violated the relevant provisions of the Controlled Substance Act; and (4) that another person died as a result. *See Commonwealth v. Peck*, 242 A.3d 1274, 1280–81 (Pa. 2020).

The statute does not require that the delivery, sale, *et cetera* of the drug occurred with the intention to cause a person to die, or that the person the defendant delivered the drugs to be the same person whose death resulted. *See Commonwealth v. Carr*, 227 A.3d 11, 16 (Pa.Super. 2020) (indicating that the statute does not require that the defendant intended to cause the death of another); *Commonwealth v. Storey*, 167 A.3d 750, 757 (Pa.Super. 2017) ("Section 2506(a)] does not require the death of the person to whom the defendant originally sold the illegal substance."). Rather, it is a question of "but for" causation, with the caveat that the result must not have been "so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." *Commonwealth v. Kakhankham*, 132 A.3d 986, 993 (Pa.Super. 2015) (cleaned up).

_____

registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance." 35 P.S. § 780-113(a)(30).

Appellant does not dispute that the Commonwealth sufficiently proved that he intentionally delivered fentanyl to a person in violation of the Act. Rather, Appellant maintains that the Commonwealth's evidence did not establish the fourth element, namely that Decedent died as a result of using the fentanyl that Appellant supplied. Specifically, Appellant argues that there was no evidence that he ever interacted with Decedent and, given the absence of drug packaging or paraphernalia, there was no evidence that Decedent ingested fentanyl from a stamp bag, let alone one that Appellant supplied to Hoffman three days prior to the death. **See** Appellant's brief at 49-50. Further, Appellant contends that the Commonwealth failed to account for Decedent's actions during the time between leaving work on the afternoon of November 19 and the discovery of his body on the morning of November 20, such that it is pure speculation that Decedent did not acquire and use fentanyl from another source. **Id**. at 51. Appellant asserts that the evidence was such that Appellant's guilt was just as likely as his innocence and, therefore, the verdict cannot stand. **Id**. at 55.

We disagree. Here, the jury's verdict was founded not upon mere speculation, but upon logical inferences. "The difference between an inference and a speculation is that an inference is a reasoned deduction from the evidence, a speculation is a guess." **Commonwealth v. Konz**, 402 A.2d 692, 700 (Pa.Super. 1979) (Spaeth, J. dissenting), *rev'd*, 450 A.2d 638 (Pa. 1982). **See also Commonwealth v. Jackson**, 955 A.2d 441, 444 (Pa.Super. 2008)

("[R]easonable inferences are predicated on proven facts and circumstances, not on suspicion or surmise."). The jury heard that Rudolph specifically indicated that the drugs he sold Decedent were a portion of the ones he bought from Hoffman on November 17, 2018. *See* N.T. Trial, 7/29/20, at 185. Video footage and Hoffman's own testimony corroborated the November 17 exchange. *Id*. at 186-92; N.T. Trial, 7/30/20, at 182. Hoffman further indicated that he had obtained the heroin/fentanyl in question from Appellant. *See* N.T. Trial, 7/30/20, at 182. Hence, there was direct evidence that drugs delivered by Appellant ended up in Decedent's hands.

The fact that Appellant's drugs sold by Rudolph to Decedent were the cause of death is established by logical deductions from the Commonwealth's circumstantial evidence. First, Decedent purchased the drugs at work before he began his shift. He then completed his shift, and arrived at the Brooks residence half an hour or less after clocking out, exhibiting none of the known signs of impairment. *See* N.T. Trial, 7/29/20, at 70, 84, 178. Second, Decedent, on notice that his relationship with Ms. Brooks would end if he continued to use drugs, and expecting her to visit him later that evening, had the motive to remove any sign of drug packaging and to be sober by later that night. *Id*. at 61, 66. Third, there was no indication of anyone coming or going to Decedent's apartment that afternoon, evening, or night. *Id*. at 758, 97-98. Fourth, Decedent's normal routine upon returning from work was to eat and then shower before watching television. *Id*. at 69-70. Fifth, the state

and location of Decedent's body and the use of three months' worth of water in a six-day period both suggest that Decedent ingested a lethal dose of fentanyl earlier rather than later on the evening of November 19. *Id*. at 117, 264. Finally, Hoffman, an experienced user, himself was incapacitated, the day after Decedent was found dead, by stamp bags purchased from Appellant that Hoffman believed to have a higher fentanyl content than usual. *See* N.T. Trial, 7/30/20, at 168-71, 180.

From this, a jury could logically conclude beyond a reasonable doubt that Appellant brought at least some of the stamp bags he purchased at work back to his apartment, ingested them, and eliminated the packaging in some manner, such as by flushing it down the toilet, to hide his drug usage from Ms. Brooks. Decedent then intended to go about his normal routine of showering before settling in on the couch, but was overtaken by the powerful drug instead, with the bath water continuing to run all night. In this way, the conclusion that Decedent died as a result of the heroin laced with a larger-than-typical amount of fentanyl that Appellant supplied to Rudolph through Hoffman was not a guess among equally plausible explanations. The verdict was based upon reasonable inferences, not pure speculation. Consequently, we conclude that the guilty verdict for drug delivery resulting in death was supported by sufficient evidence.

Appellant also claims that the Commonwealth's evidence was insufficient to sustain his conviction for corrupt organizations. Appellant was

convicted pursuant to the following provision of the corrupt organizations statute: "It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 Pa.C.S. § 911(b)(3). The statute defines racketeering activity as, *inter alia*, "[a]n offense indictable under . . . The Controlled Substance, Drug, Device and Cosmetic Act (relating to the sale and dispensing of narcotic drugs)" or a conspiracy to commit such offense. 18 Pa.C.S. § 911(h)(1)(ii)-(iii). A pattern of such activity is "a course of conduct requiring two or more acts of racketeering activity one of which occurred after the effective date of this section." 18 Pa.C.S. § 911(h)(4).

Appellant does not dispute the Commonwealth's proof that he engaged in a pattern of racketeering activity. The only element with which Appellant takes issue is that he was employed or associated with an enterprise. "Enterprise" for purposes of § 911 means "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S. § 911(h)(3).

We conclude that the Commonwealth produced adequate evidence to prove that Appellant was part of an enterprise. Fourness testified that he and his wife reached an agreement with Appellant that they would acquire drugs

only from him, and Appellant agreed to sell only to the Fournesses. *See* N.T. Trial, 7/30/20, at 155. Exchanges between Appellant and Fourness or one of his runners occurred dozens of times between late 2018 and early 2019. *Id*. at 121-25. Fourness identified recognizable packaging for some of the drugs, such as a "Kill Bill" stamp. *Id*. at 127. The individuals in the organization had defined roles and took measures to ensure the continuing viability of the "day-to-day operations," such as utilizing replacement runners and street-level dealers when others were unavailable and utilizing Facetime for last-minute delivery arrangements to verify the identify of those involved. *Id*. at 116, 123.

This was no mere one-off conspiracy, but a continuing association in fact that only ceased when too many members were taken down within a short timeframe. Thus, Appellant's corrupt organizations conviction is founded on sufficient evidence. *Accord Commonwealth v. Hill*, 210 A.3d 1104, 1114 (Pa.Super. 2019) (indicating that there was no viable challenge to the existence of an enterprise where "the evidence demonstrate[d] that [the defendant] and . . . straw purchasers formed an association in fact to carry out illegal purchases of firearms"). Appellant's second sufficiency challenge fails.

We next consider Appellant's claim that Clarion County was not a proper venue for Case 169.[13] Our Supreme Court has specified that appellate review of a venue ruling examines "whether the trial court's factual findings are supported by the record and its conclusions of law are free of legal error." *Commonwealth v. Gross*, 101 A.3d 28, 33-34 (Pa. 2014). The trial court's task, when venue is challenged by a defendant, is to determine whether the Commonwealth established the propriety of venue by a preponderance of the evidence. *Id*.

Venue for criminal cases "belongs in the place where the crime occurred." *Id*. at 33 (cleaned up). In other words, that it is a location "with which the defendant may be criminally associated, either directly, jointly, or vicariously." *Id*. The Rules of Criminal Procedure speak to venue, in relevant part, as follows:

> **(A) Venue**. All criminal proceedings in summary and court cases shall be brought before the issuing authority for the magisterial district in which the offense is alleged to have occurred or before an issuing authority on temporary assignment to serve such magisterial district, subject, however, to the following exceptions:
>
> . . . .
>
> (3) When charges arising from the same criminal episode occur in more than one judicial district, the criminal proceeding on all the charges may be brought

---

[13] Although Appellant's pretrial motion referenced jurisdiction, the propriety of venue in Clarion County, rather than that court's jurisdiction, was implicated. *See*, *e.g.*, *Commonwealth v. Bethea*, 828 A.2d 1066, 1074 (Pa. 2003) ("[A]ll courts of common pleas have statewide subject matter jurisdiction in cases arising under the Crimes Code.").

before one issuing authority in a magisterial district within any of the judicial districts in which the charges arising from the same criminal episode occurred.

Pa.R.Crim.P. 130.

Hence, "a condition precedent to the exercise by a single county to jurisdiction in a case involving multiple offenses in various counties is [that] the offense must constitute a single criminal episode." *Commonwealth v. Witmayer*, 144 A.3d 939, 946 (Pa.Super. 2016) (cleaned up). "Where a number of charges are logically or temporally related and share common issues of law and fact, a single criminal episode exists." *Commonwealth v. Kohler*, 811 A.2d 1046, 1050 (Pa.Super. 2002) (cleaned up). We have expounded on these aspects of a single criminal episode as follows:

> [To ascertain] whether a number of statutory offenses are logically related to one another, the court should initially inquire as to whether there is a substantial duplication of factual, and/or legal issues presented by the offenses. The mere fact that the additional statutory offenses involve additional issues of law or fact is not sufficient to create a separate criminal episode since the logical relationship test does not require an absolute identity of factual backgrounds.
>
> The temporal relationship between criminal acts will be a factor which frequently determines whether the acts are logically related. However, the definition of a single criminal episode should not be limited to acts which are immediately connected in time. Transaction is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.

*Witmayer*, *supra* at 946–47 (cleaned up).

In denying Appellant's pretrial motion, the trial court held that the charges in Case 169 based upon possession and delivery of drugs in Allegheny County were part of the same criminal episode as the charges in Case 168 concerning the drug delivery that resulted in Decedent's death. Specifically, the court cited the close temporal proximity of the events at issue, as well as the identity of controlled substances and location of Appellant's drug deliveries to the various individuals. *See* Order, 8/28/19, at unnumbered 2-3.

Appellant argues that this was error because the two cases have "no shared identity of factual backgrounds," as no person in the corrupt organization at issue in Case 168 "had any involvement with the criminal activity alleged" in Case 169. *See* Appellant's brief at 37. Appellant further contends that there was no temporal relation between the cases, as the allegations in Case 168 "primarily occurred in November 2018 and ended on or before February 2019," while the activity at issue in Case 169 "did not occur until March 2019." *Id*. at 38.

We agree with the trial court that the events in the two cases are sufficiently logically and temporally related to constitute a single criminal episode. During the time period at issue in both cases, Appellant operated a continuous drug distribution operation out of 331 Noel Drive in Monroeville, Allegheny County. As detailed in our discussion above, Appellant furthered this operation through his association with the Fournesses until that fell apart in February 2019, but continued selling the same drugs using the same

packaging from the same location in the following weeks. The March 2019 deliveries were not a second, different criminal episode, but a continuation of what Appellant had been doing all along. *Compare Commonwealth v. Hunter*, 768 A.2d 1136, 1141 (Pa.Super. 2001) (holding trial of corrupt organizations trial in county where homicide allegedly occurred was proper because all the activities were connected to the drug dealing operation), *with Commonwealth v. Callen*, 198 A.3d 1149, 1161 (Pa.Super. 2018) (holding the abuse of children in one county through association with their stepfather was not part of the same criminal episode as the abuse of another girl eight years later in a different county facilitated by the defendant's role as a gymnastics teacher). No relief is due.[14]

---

[14] Even if the cases did not involve a single criminal episode such that it was error for the trial court to decline to transfer Case 169 to Allegheny County, we are convinced beyond a reasonable doubt that the error was harmless. In granting the Commonwealth's motion to join Cases 168 and 169 for trial, the trial court ruled that the evidence of each was admissible in the trial of the other. *See* Trial Court Opinion, 2/3/20, at 5-8 (explaining that joinder of Cases 168 and 169 was proper because, *inter alia*, they "require overlapping facts and evidence to be presented to prove both at trial"). Appellant does not challenge that ruling on appeal, and we discern no error in it. Furthermore, nothing in the certified record evinces impermissible forum shopping on the part of the prosecution, but instead mere efficiency given that the charges all involved Appellant's drug dealing operation that was discovered by a single investigation originating in Clarion County. *Compare* N.T. Pretrial Motion, 8/12/19, at 37 (Commonwealth detailing that both cases pertain to the same ongoing activity and investigation such that judicial economy is served by trying them together), *with Commonwealth v. Callen*, 198 A.3d 1149, 1163 (Pa.Super. 2018) (finding error was not harmless where there appeared to be "the distinct possibility" that "the Commonwealth was engaging in an act of impermissible forum shopping").

Next, Appellant claims that the trial court committed reversible error in refusing to continue the hearing on his omnibus pretrial motion. "Whether a continuance should be granted in order for the defendant to secure counsel of his choosing is a matter within the discretion of the trial judge, and no prophylactic rule exists for determining when a denial of a continuance amounts to a violation of due process." *Commonwealth v. Gray*, 608 A.2d 534, 547 (Pa.Super. 1992). As such, "a trial court's decision to deny a request for a continuance will be reversed only upon a showing of an abuse of discretion." *Commonwealth v. Hernandez*, 230 A.3d 480, 484 (Pa.Super. 2020) (cleaned up). It is well-settled that "an abuse of discretion is not merely an error of judgment. Rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." *Id*. (cleaned up).

> This Court will not find an abuse of discretion if the denial of the continuance request did not prejudice the appellant. In order to demonstrate prejudice, the appellant must be able to show specifically in what manner he was unable to prepare his defense or how he would have prepared differently had he been given more time.

*Commonwealth v. Broitman*, 217 A.3d 297, 299-300 (Pa.Super. 2019) (cleaned up).

---

With nothing in the certified record even suggesting that the result in either case would have differed had they been tried separately in different counties, we conclude that Appellant's venue issue merits no relief.

The Rules of Criminal Procedure provide as follows, in pertinent part, regarding continuance requests:

> (A) The court or issuing authority may, in the interests of justice, grant a continuance, on its own motion, or on the motion of either party.
>
>      . . . .
>
> (C) When the matter is in the court of common pleas, the judge shall on the record identify the moving party and state of record the reasons for granting or denying the continuance.  The judge also shall indicate on the record to which party the period of delay caused by the continuance shall be attributed and whether the time will be included in or excluded from the computation of the time within which trial must commence in accordance with Rule 600.
>
> (D) A motion for continuance on behalf of the defendant shall be made not later than 48 hours before the time set for the proceeding.  A later motion shall be entertained only when the opportunity therefor did not previously exist, or the defendant was not aware of the grounds for the motion, or the interests of justice require it.

Pa.R.Crim.P. 106.

Here, Appellant sought a continuance in order to proceed with retained counsel rather than his court-appointed attorney.  "Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution guarantee a defendant's right to counsel." *Broitman*, *supra* at 300.  "In addition to guaranteeing representation for the indigent, these constitutional rights entitle an accused to choose at his own cost and expense any lawyer he may desire." *Id*. (cleaned up).  However, it is not an absolute right. *See*, *e.g.*, *Hernandez*, *supra* at 484.  Our Supreme Court explained:

[T]he right of the accused to choose his own counsel, as well as the lawyer's right to choose his clients, must be weighed against and may be reasonably restricted by the state's interest in the swift and efficient administration of criminal justice. Thus, this Court has explained that while defendants are entitled to choose their own counsel, they should not be permitted to unreasonably clog the machinery of justice or hamper and delay the state's efforts to effectively administer justice. At the same time, however, we have explained that a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.

***Commonwealth v. McAleer***, 748 A.2d 670, 673–74 (Pa. 2000) (cleaned up).

In the case *sub judice*, the trial court observed that Appellant knew of the hearing since June 2019, but waited until August to retain counsel, who then filed a last-minute continuance request in the late afternoon of the Friday before the Monday morning hearing.[15] ***See*** Trial Court Opinion, 5/12/22, at unnumbered 3. The court also noted that Appellant had able representation at the hearing by Attorney Marshall, who had filed the motion at issue and was still counsel of record. ***Id***. at unnumbered 2. Furthermore, the court did not mandate that Appellant proceed at the hearing with Attorney Marshall, but instead gave Appellant the option to have Attorney Marshall's timely omnibus

_____

[15] The motion, time stamped 3:41 p.m. on Friday was filed more than forty-eight hours before the 9:00 a.m. Monday hearing, but nearly all of the time between was outside of normal business hours. While the filing may not be late according to the letter of Rule 106(D), it certainly violates its spirit.

pretrial motion dismissed, albeit without guaranteeing that Attorney Jobe would be able to file a timely motion of his own.[16]  *Id*. at unnumbered 2-3.

Appellant argues that, in declining "to probe the reasons for [Appellant's] dissatisfaction with court-appointed counsel," the fact that this was the first continuance request and that there was a lack of any prejudice to the Commonwealth rendered the trial court's refusal to allow him to be represented by Attorney Jobe in litigating pretrial motions a deprivation of his constitutional right to counsel, amounting to a structural error mandating a new trial.[17]  *See* Appellant's brief at 26, 28.  Appellant maintains that this

_____

[16]  Appellant asserts that the trial court indicated that it "would not permit [Appellant's] privately-retained counsel to file pretrial motions in the future." Appellant's brief at 28.  That is not accurate.  What the court said is, "I am not saying that your attorney is going to be able to file another motion."  N.T. Pretrial Motion, 8/12/19, at 16.  The court left open the possibility that "this stuff" that Appellant wished to raise with Attorney Jobe would be considered at a later date.  *Id*. ("Maybe it will.  Maybe it won't.").

[17]  Appellant relies on *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), for the proposition that the error alleged in this appeal is structural. In *Gonzalez-Lopez*, the trial court erroneously deprived the defendant of counsel of his choice by improperly denying the attorney's admission *pro hac vice* and precluded the defendant from even consulting or meeting with the attorney throughout the trial.  The U.S. Supreme Court determined that this conceded trial court error pervaded the entire trial and was indeed structural error, but it plainly stated:  "This is not a case about a court's power to enforce rules or adhere to practices that determine which attorneys may appear before it, **or to make scheduling and other decisions that effectively exclude a defendant's first choice of counsel**."  *Id*. at 152 (emphasis added).  As this case involves a scheduling decision that impacted only a pretrial hearing, after which Appellant was represented by counsel of choice for additional pretrial motions, trial, and sentencing, *Gonzalez-Lopez* is not on point. Rather, we consider the prejudice analysis applicable to denials of continuance

Court's decision in *Commonwealth v. Prysock*, 972 A.2d 539, 545 (Pa.Super. 2009), "controls the outcome of this case because the facts in *Prysock* are materially similar to those present here." Appellant's brief at 28.

In *Prysock*, appointed counsel informed the court just prior to jury selection that the defendant was dissatisfied and wished to hire private counsel. The court refused the request and proceeded with the defendant objecting and asking for private counsel "because counsel would not allow him to have the final say in jury selection." *Prysock*, *supra* at 540. The next day, private counsel attempted to enter his appearance but, unaware that half of the jury had already been selected, indicated that he was not prepared to go to trial that day. The court denied the request and trial proceeded with appointed counsel over the defendant's objections. "On several subsequent occasions during trial, [the defendant] stated his dissatisfaction with [appointed counsel's] representation, and the trial court was forced to intervene to resolve problems between [the two]." *Id*. at 541. This Court, determining that the defendant's "difficulties with appointed counsel pervaded every aspect of the trial," held that the denial of the continuance was reversible error that warranted a new trial. *Id*. at 545.

We find *Prysock* materially dissimilar to the circumstances of the instant case. Here, Attorney Jobe's eleventh-hour motion, filed a week after

_____

requests noted above. *See Commonwealth v. Broitman*, 217 A.3d 297, 299-300 (Pa.Super. 2019).

he entered his appearance, implicated not trial, but one pretrial hearing. There is nothing in the certified record that reflects that Appellant had "irreconcilable differences with his appointed counsel" that pervaded that hearing, let alone the entire trial, or that he "received less than competent representation" in litigating the motion. ***Commonwealth v. Brooks***, 104 A.3d 466, 477 (Pa. 2014). Indeed, as we noted above, Appellant was unable to identify any issue appropriate for a pretrial motion that Attorney Marshall failed to raise when questioned on the record about Attorney Marshall's motion at a subsequent pretrial hearing at which Appellant was represented by Attorney Jobe. ***See*** N.T. Rule 600 Hearing, 11/4/19, at 12-13. Further, as the Commonwealth aptly notes, while Attorney Jobe filed and litigated other motions prior to trial, he "did not file any motion to reconsider or additional [omnibus pretrial motions] in the next year leading up to trial." Commonwealth's brief at 18-19 (cleaned up).

Additionally, the facts that the trial court denied the written continuance request before hearing from the parties and did not probe into the Commonwealth's position on the continuance are not determinative. Our Supreme Court has indicated that neither the Commonwealth's lack of opposition to a continuance nor the trial court's failure "to assume that the request must be granted, and then probe the party (here, a defendant represented by counsel) for support for the request, or to find weaknesses in the request" evinces an abuse of discretion. ***See Brooks***, ***supra*** at 477.

- 32 -

While this Court may have ruled differently on the request, the certified record does not support a finding that the trial court's denial of the continuance was manifestly unreasonable "or the result of partiality, prejudice, bias, or ill-will[.]" **Hernandez**, **supra** at 484 (cleaned up). As such, we must conclude that the trial court's decision was a proper exercise of its discretion. **See Commonwealth v. Thomas**, 879 A.2d 246, 262 (Pa.Super. 2005) (affirming denial of a continuance of a long-scheduled hearing where the defendant "did not exercise his right to cho[o]se counsel at a reasonable time nor in a reasonable manner"). Moreover, the certified record before us contains no indication that Appellant was prejudiced by the denial of the continuance. Consequently, no relief is due.

Appellant's final issue challenges the trial court's denial of his suppression motion. Accordingly, we are governed by the following legal principles:

> In reviewing appeals from an order denying suppression, our standard of review is limited to determining whether the trial court's factual findings are supported by the record and whether its legal conclusions drawn from those facts are correct. When reviewing the rulings of a trial court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. Our scope of review is limited to the evidence presented at the suppression hearing.

**Commonwealth v. Bellamy**, 252 A.3d 656, 663 (Pa.Super. 2021) (cleaned up).

"The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution both protect against unreasonable searches and seizures. A search conducted without a warrant is constitutionally impermissible unless an established exception applies." *Commonwealth v. Randolph*, 151 A.3d 170, 176-77 (Pa.Super. 2016) (cleaned up). Exigent circumstances are among the recognized exceptions. *See*, *e.g.*, *Commonwealth v. Alexander*, 243 A.3d 177, 208 (Pa. 2020) ("[I]n some circumstances the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." (cleaned up)).

However, it is well-settled that governmental "intrusion into a particular area, whether in an automobile or elsewhere, cannot result in a [constitutional] violation unless the area is one in which there is a constitutionally protected reasonable expectation of privacy." *Commonwealth v. Shabezz*, 166 A.3d 278, 288 (Pa. 2017) (cleaned up). Stated differently, "under Article I, Section 8, no less than under the Fourth Amendment, a defendant cannot prevail upon a suppression motion unless he demonstrates that the challenged police conduct violated his own, personal privacy interests." *Commonwealth v. Millner*, 888 A.2d 680, 692 (Pa. 2005). To establish the requisite expectation, "a defendant first must manifest a subjective expectation of privacy in the object of the challenged

search, and then demonstrate that society is willing to recognize that expectation as reasonable." **Shabezz**, **supra** at 288 (cleaned up).

Appellant repeatedly indicates in his appellate brief that he was arrested on March 12, 2019, when the Monroeville police stopped **his** car and seized heroin from it without a warrant. **See** Appellant's brief at 41-42. On this basis, he maintains that the seizure was unlawful because "at the suppression hearing, no evidence was offered to establish the existence of an exigency" or other exception to the warrant requirement. **Id**.

However, the Commonwealth aptly corrects Appellant's misstatements, observing that Appellant was not stopped in either of the two vehicles connected with him, but was merely a **passenger** in **Mr. Smith's Toyota** that Mr. Smith was driving. **See** Commonwealth's brief at 21. **See also** N.T. Preliminary Hearing, 4/9/19, at 43-44, 57 (indicating that the vehicle in question was Mr. Smith's Toyota and Appellant was riding in the front passenger seat). The Commonwealth asserts that Appellant proffered no evidence to suggest "that he had a reasonable expectation of privacy in the floorboards of a vehicle" in which he was a mere passenger and had no ownership interest. **Id**. at 22.

Our review of the certified record confirms that no evidence proffered at the suppression hearing suggested that Appellant had an expectation of privacy in Mr. Smith's vehicle. Therefore, Appellant failed to demonstrate that the search of the vehicle following his lawful warrantless arrest required the

evidence obtained therefrom to be suppressed. ***See***, ***e.g.***, ***Millner***, ***supra*** at 692 (reversing grant of suppression where the defendant "produced no evidence that he owned the vehicle, nor did he produce evidence which remotely suggested that he had any other connection to the vehicle which could form the basis for so much as a subjective expectation of privacy," nor was there anything "in the Commonwealth's evidence upon which [the defendant] could rely to prove that he had an expectation of privacy in the [vehicle] in question"); ***Commonwealth v. Burton***, 973 A.2d 428, 436 (Pa.Super. 2009) (*en banc*) (rejecting challenge to suppression denial where the defendant "failed to demonstrate that he had a reasonably cognizable expectation of privacy in a vehicle that he did not own, that was not registered to him, and for which he has not shown authority to operate").

For the foregoing reasons, none of Appellant's issues warrants relief from this Court. Thus, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judge Murray joins this Memorandum.

Judge Pellegrini files a Concurring & Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/6/2023

- 36 -